UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. CR 07-01172 (A) DDP |
| Plaintiff, | ) ) | |
| v. | ) ) | **ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS** |
| SERGIO PANTOJA, et al. , | ) ) ) | [Dkt. Nos. 1948, 2001] |
| Defendants. | ) | |

Presently before the court is Defendant Vladimir Iraheta's Motion to Dismiss Fourth Superseding Indictment (Dkt. No. 2001), as well as Defendant Eduardo Hernandez's Motion to Dismiss Fourth Superseding Indictment (Dkt. No. 1948), in which Defendants Leonidas Iraheta, Vladimir Iraheta, and James Wooten join. Having considered the submissions of the parties and heard oral argument, the court denies the motions and adopts the following order.

**I. Background**

Defendants Eduardo Hernandez, Leonidas Iraheta, and Vladimir Iraheta are charged in the Fourth Superseding Indictment with, among other charges, the Violent Crime in Aid of Racketeering ("VICAR") murder of victim J.B. on July 21, 2001, in violation of

18 U.S.C. Sections 1959(a)1 and 2(a) and California Penal Code Sections 31. 187, and 189. Defendant Wooten is charged with VICAR conspiracy to assault victim F.C., VICAR assault of F.C., and the VICAR murder of victim L.A.G. on September 15, 2007, in violation of 18 U.S.C. Sections 1959(a)1, (a)2, (a)5 and 2(a) and California Penal Code Sections 31, 187, and 189. Defendants now move to dismiss the Fourth Superseding Indictment on the basis of government misconduct before the grand jury.

**II. Legal Standard**

A district court may dismiss an indictment in cases of constitutional error, where the integrity of grand jury proceedings "have been so compromised as to render the proceedings fundamentally unfair." United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992) (internal quotation and citation omitted); See also United States v. Chapman, 524 F.3d 1073, 1084 ("[A] district court may dismiss an indictment on the ground of outrageous government conduct if the conduct amounts to a due process violation."). The court may also exercise its supervisory powers to dismiss an indictment where "there is grave doubt that the decision to indict was free from the substantial influence of the misconduct." Isgro, 974 F.2d at 1094 (quotation and alteration omitted).

**III. Discussion**

　A. The 2001 J.B. Murder

　　Defendants Hernandez and Vladimir Iraheta assert that Supervisory Special Agent Paul Keenan ("Agent Keenan") misrepresented material facts to the grand jury. The court addresses each contention in turn.

　　　1. Parking Location

### a. J.V.'s Statement

During a 2007 proffer session, cooperator J.V. stated that he knew about a murder that took place "two or three years" ago. According to J.V., Defendant Vladimir Iraheta told him that Defendants V. Iraheta, L.Iraheta, and Hernandez (collectively, Defendants) went looking for a rival gang member to shoot, parked a gold Toyota Camry near 4th Street and Witmer Street, then chased down and shot an individual they believed to be a member of a rival gang.

### b. Agent Keenan's Testimony

Agent Keenan testified before the grand jury.[1] While pointing to a map, Agent Keenan stated "[J.V.] remembers that they park on Witmer Street . . . and 4th. Based on the description, it's probably more like 2nd Street." (Government's Consolidated Opposition, Ex. A at 60.) Agent Keenan testified to the existence of graffiti reflecting Defendants' alleged gang affiliation and monikers near the intersection of 2nd Street and Witmer Street. (Id. at 65.) He then showed the grand jury pictures of the graffiti, stating "The first one you see here . . . is 2nd and Witmer. That's why I believe they parked at 2nd and Witmer because that's where the graffiti started up." (Id. at 65:8-19.) Agent Keenan continued, "[J.V.] told us they parked on Witmer and 4th. But I don't know that - it seems to me, if the tagging started here(indicating) and they parked at Witmer, it's more likely they parked at Witmer and Second." (Id. at 84:22-85:1.) Agent Keenan

---

[1] Agent Keenan testified before a grand jury in 2008, then testified again in 2011 before the grand jury that returned the Fourth Superseding indictment.

3

later added, "[J.V.] said he believed they parked near 4th and Witmer. . . . As you can see, right here is 4th Street and here is Witmer. They do not intersect." (Opp. Ex. B at 39:17-22.)

    c. Discussion

Defendants assert that Agent Keenan "insinuate[d] he has some basis to believe J.V. really means 2nd and Witmer when in fact no such basis exists," (V. Iraheta Br. at 5.) and that "Agent Keenan testified before the Grand Jury that it was 'probably more like 2nd street.' Agent Keenan provided this alternative fact out of thin air […]." (Hernandez Br. at 4.) Defendants' contentions are not supported by the record. Agent Keenan explicitly told the grand jury that J.V. had said 4th and Witmer, but that Agent Keenan believed it more likely that Defendants parked at 2nd and Witmer because of the graffiti located there and because 4th Street and Witmer do not intersect. Agent Keenan did not, therefore, misstate J.V.'s testimony regarding Defendants' parking location.

    2. Deputy Ching's Observation of Three Taggers

Agent Keenan explained to the grand jury that during the course of his review of the evidence of the 2001 J.B. murder, Agent Keenan discovered a statement from Los Angeles County sheriff's deputy Ching, "who was actually on surveillance at the time . . . on Columbia Avenue . . . and 3rd."[2] (Opp. Ex. A at 72). According to Agent Keenan:

---

[2] The intersection of Columbia and 3rd is approximately two blocks southwest of the intersection of 2nd Street and Witmer Street.

4

> [Deputy Ching] said that he had seen three Hispanic
> males spray painting, tagging. He said one was doing
> the tagging, and the another [sic] one was doing acting
> as a lookout, and a third one was a little farther
> away, and he was grabbing at the front of his waistband
> underneath his shirt as if he had something underneath
> his shirt. He said that one of the individuals
> actually came up to the car and looked in his car to
> see if there was anybody sitting in there to make sure
> that they weren't being observed.

Id. at 72:20-73:1-4.

Defendants argue that Agent Keenan's representation that Deputy Ching stated that one of the taggers peered into the car window specifically to make sure the taggers weren't being observed is "not borne out by the government's discovery and or the evidence." (Hernandez Br. at 6). The record does not conclusively establish whether Deputy Ching specifically stated that the taggers looked into the car "in order to make sure they weren't being observed." Even if Agent Keenan did append that logical inference to Deputy Ching's statement, however, Defendants provide no explanation of how Agent Keenan's addition caused them any prejudice or rendered the grand jury proceeding unfair in any way.

    3. Deputy Ching's Identification of the Murder Suspects

       a. Deputy Ching's Statements

In a 2001 written statement, Deputy Ching stated that after hearing gunshots,[3] he observed a dark colored SUV driving

---

[3] J.B. was killed near the intersection of 4th Street and Loma Drive, approximately two blocks southwest of Deputy Ching's surveillance location at 3rd and Columbia.

5

southbound on Columbia.[4] Deputy Ching stated that the driver "at first resembled the [tagger] I described earlier," but, "I'm pretty sure it was not him."

In 2008, Agent Keenan and a Detective Holmes interviewed Deputy Ching.[5] During this 2008 interview, Deputy Ching stated that he saw three people running north after the shooting, and that they were the same three people Deputy Ching observed tagging prior to the shooting. Deputy Ching stated that out of six individuals presented in a photo line up, Vladimir Iraheta's head was "most like" one of the three taggers and that Leonidas Iraheta was "most like the heavy guy I saw tagging." Deputy Ching further stated that the driver of the SUV was "either the same person [Ching] saw tagging before the shooting or else a relative of his," and identified Eduardo Hernandez as "most like the guy I saw driving the vehicle after the shooting."

### b. Agent Keenan's Testimony

Agent Keenan testified that he ran the license plate of the SUV that Deputy Ching observed, and that the car had been rented to Eduardo Hernandez at the time of the shooting. (Opp. Ex. A at 81:17-20.) Agent Keenan further stated:

---

[4] Deputy Ching's statement has not been provided as an exhibit. For purposes of this order, the court relies on Defendants' representations of the statement, which the government does not contest.

[5] As with Deputy Ching's 2001 statement, Detective Holmes' report of this 2008 interview has not been provided to the court. The court again relies on the representations of the parties, which do not appear to conflict.

6

> We tracked down [Deputy Ching] and reinterviewed him. We put together some photographic lineups for him. He was able to positively ID Eduardo Hernandez as the driver of the Expedition that night. And he was able to say that [Vladimir Iraheta] was - out of the six-pack lineup, out of six photos, he picked out [Vladimir Iraheta] as the one looking most like the guy that came up and looked into his car.

Opp. Ex. A at 82:10-17.

### c. Discussion

Defendants contend that Deputy Ching's 2001 statement conflicts with his 2008 statements and that Agent Keenan misrepresented Deputy Ching's statements, did not describe the discrepancies in Deputy Ching's two accounts to the grand jury, and failed to present other, conflicting identifications from other witnesses to the grand jury. (V. Iraheta Br. at 4, Herndanez Br. at 6-7.)

The court concludes that there was no fundamental unfairness or prejudice related to Agent Keenan's description of Deputy Ching's statements. As an initial matter, Agent Keenan correctly stated that Deputy Ching identified Vladimir Iraheta as "most like" one of the taggers. While Agent Keenan's representation that Deputy Ching "was able to positively ID Eduardo Hernandez as the driver" was a somewhat inaccurate description of Deputy Ching's "most like" identification, it did not rise to the level of fundamental unfairness, and, particularly in light of Agent Keenan's testimony that Hernandez had rented the SUV in question, is unlikely to have prejudiced Defendant Hernandez.

With respect to Deputy Ching's conflicting recollections, the "grand jury need not be advised of all matters bearing on the credibility of a potential witness." United States v. Thompson, 576 F.2d 784, 786 (9th Cir. 1978). Agent Keenan's failure to point out discrepancies between Deputy Ching's 2001 and 2008 statements therefore did not render the proceedings unfair. While intentional presentation of perjured testimony might warrant dismissal of the indictment, there is no such allegation here. See Id.

4. Additional Issues

Defendants argue, and the government concedes, that Agent Keenan made some errors in his 2008 testimony before the grand jury. Agent Keenan stated, for example, that Deputy Ching followed the SUV north, rather than south, and that certain individuals heard gunshots near the murder scene when, in fact, they had not. Agent Keenan corrected these errors, however, before the grand jury that returned the Fourth Superseding Indictment. Regardless of whether those errors were initially misleading in any way, the grand jury that returned the operative indictment was not misled.[6]

Defendants also argue that Agent Keenan falsely stated that Deputy Ching identified himself to the occupants of the SUV, who then fled. The government asserts that Deputy Ching did make such a statement, and that he will testify to that effect. The

---

[6] The extent to which these errors may bear on possible impeachment testimony at trial is not currently before the court.

8

government further asserts that, at the very least, Deputy Ching did believe, and did state, that the occupants of the SUV realized they were being followed before they fled from Deputy Ching. On these facts, the court finds no basis to conclude that grand jury proceedings were in any way tainted or that any defendant was prejudiced.

### B. The 2007 F.C. Assault and L.A.G. Murder

Detective Holmes testified to the grand jury regarding the September 2007 assault on F.C. and murder of L.A.G. Defendant Wooten argues that Detective Holmes mislead the jury about 1) the identity of individuals in the assailants' vehicle and 2) the knowledge of the individuals in that vehicle.

#### 1. Identity of Passengers in the Truck

##### a. G.M.'s Statement

In a tape-recorded interview, cooperator G.M. described the events leading up to the assault and murder. G.M. stated that the assailants drove a truck to the scene of the assault. When asked who was in the truck, G.M. responded, "Silly, me, and Face."[7] (Opp. Ex. C. at 51:1). G.M. elaborated that "[i]t was Silly driving, Face in the passenger's side, and I was in the back." (Id. at 51:11-12.)

##### b. Detective Holmes' Testimony

---

[7] The parties agree that Defendant Wooten, who allegedly uses the moniker "Crow," is neither Silly nor Face.

9

Detective Holmes testified that "[G.M.] stated that himself, Face, Crow, La Bullet, Shorty, got into Face's gray pickup truck. Big Silly was driving." (Opp. Ex. D at 19:22-25.)

### c. Discussion

Detective Holmes' statement to the grand jury was demonstrably false. G.M. stated that three people: himself, Silly, and Face, were in the truck prior to the shooting. According to Detective Holmes, however, G.M. identified an additional three occupants: La Bullet, Shorty, and Defendant Wooten (Crow). G.M., however, never said that La Bullet, Shorty, and Crow were in the car on the way to the assault.

The error, however, only justifies dismissal of the indictment if it caused constitutional error or actual prejudice. Isgro, 974 F.2d at 1094. The court concludes that Detective Holmes' error did not result in fundamental unfairness or prejudice to Defendant Wooten. The government has represented to the court that Detective Holmes knew that Defendant Wooten was in the truck because Silly, the driver of the truck, had already said so in an interview prior to Detective Holmes' testimony to the grand jury. (Government's Supplemental Submission re: Motions to Dismiss Fourth Superseding Indictment.) No Defendant has contested the government's representation. It therefore appears that Detective Holmes misattributed the statement that Crow was present in the truck to G.M., when in fact Silly had provided that

information to investigators.[8] That fact did not significantly impact the integrity of the proceeding, and is unlikely to have affected the jury's reasoning, and, therefore, does not warrant dismissal of the indictment.

2. Knowledge of Passengers in the Truck

a. G.M.'s Statements

G.M. spoke with investigators about what the occupants of the truck knew about the purpose of their trip. According to G.M.:

> I tell [Face], 'where are we going?' He was like, 'Oh, we're going to go to Burlington.' I went like, 'for what?' he - he goes like, 'Don't trip. You're going to find out when we get there. All you - all you need to know is - all you got to know is that Tricky gave - gave the order.' And I'm thinking 'alright.' You know, I'm already getting an idea of what's going to happen, not the shooting. Because we didn't leave with no gun from the house.

(Opp. Ex. C. at 51:14-24.) G.M. reiterated, "I tell Face, 'Hey where are we going to go?' He's like 'don't worry about it. You're going to find out when we get there. All you need to know is that Tricky gave the order.'" (Opp. Exh. C 175: 1-4.) A colloquy followed:

| | |
|---|---|
| Interviewer: | Well, this was a conversation that could be heard by all people inside the truck? |
| G.M.: | Yes, ma'am. Yes, ma'am. |
| Interviewer: | Is that right? |
| G.M.: | Yes, ma'am. |
| Interviewer: | Clearly? |
| G.M.: | Clearly. |

---

[8] G.M. did also state that Crow, La Bullet, and Shorty were in the truck <u>after</u> the shooting. (Opp. Ex. C. at 73.)

11

(Opp. Ex. C. at 176:19-25.)

G.M. further stated that after the shooting, the truck picked him up at a predetermined meeting place, and that Defendant Wooten was in the truck at that point. (Opp. Ex. C. at 73.) According to G.M., "I know Crow went like, 'God damn. I heard them shots.'" (Id. at 75:4-5.) When specifically asked what Crow said, G.M. stated, "Like that he heard the shots and that - he just looked at me like - like, you know?" and "Like, he said, like, Man," and, finally, "He goes like this, 'Did - did you shoot him? Did - did you hit him?'" (Id. at 75:7-16.)

### b. Detective Holmes' Testimony

Detective Holmes testified that "On the way over there, Face told [G.M.] essentially he had to do something. [G.M.] had asked him what it was he had to do. Face told him 'don't worry about it. I'll tell you when we get there,' told him Tricky gave the order." (Opp. Exh. D. at 20:14-18.)

Grand jurors asked specific follow-up questions about the discussions in the truck. First, a juror asked about the conversation in the truck after the shooting, and specifically asked, "Who said 'Did you do it?'" (Opp. Ex. D at 91:7.) Detective Holmes answered, "[G.M.] said basically that was the conversation, that they were all kind of saying it. He never pinpointed that to a specific person in the truck whether it be Crow, La Bullet, or Shorty." (Id. at 91:9-12.) A juror then asked, "And did they know what it

was? Was there any more conversation that elaborated, 'Did you do it?'" (Id. at 91:16-18.) Detective Holmes responded, "[H]e believed that they knew what was going to happen, and essentially it was did he do it, 'Did you shoot?'" (Id. at 91:21-24.)

A juror then asked about the basis of G.M.'s belief, and whether the prior discussion with Face happened in front of "these people." (Id. at 91:24-92:1.) Detective Holmes responded, "The primary conversation was between Face and [G.M] as to what they were going up to do at the time." (Id. at 92:4-7.) Detective Holmes continued, "In the truck. And essentially also that Tricky had given the order. In [G.M.]'s mind at least, he said everybody had to have heard it. They were all in the truck, you know, on the way up there, and in his mind, he said everybody had to have heard that was in the truck what they were going to go do." (Id. at 92:9-14.) Detective Holmes concluded the line of questioning by confirming that it was just G.M.'s belief that everyone in the truck on the way to the assault had to have heard what was going to happen. (Id. at 91:17.)

        C.  Discussion

Detective Holmes did not misrepresent G.M.'s statements regarding the knowledge of the occupants of the truck. Though, as discussed supra, G.M. did not place Defendant Wooten in the truck prior to the assault, G.M. did opine that everyone in the truck clearly heard that they were on their way to do something for which "Tricky gave the order." According to G.M., Defendant

13

Wooten did say, "Did you do it, did you shoot?" upon G.M.'s return to the truck. Detective Holmes' testimony to the grand jury was consistent with G.M.'s statements, and did not materially misstate G.M.'s belief, informed by Wooten's post-incident statements, that everyone in the truck knew that something was going to happen on an order from Tricky.[9]

**IV. Conclusion**

The court finds that there was no misconduct before the grand jury that rendered grand jury proceedings fundamentally unfair or otherwise prejudiced any of the defendants. Accordingly, the Motions to Dismiss the Fourth Superseding Indictment are DENIED.[10]



IT IS SO ORDERED.

Dated: February 17, 2012

DEAN D. PREGERSON
United States District Judge

---

[9] Indeed, to the extent Detective Holmes erred, his error benefitted Defendant Wooten. Detective Holmes represented that G.M. did not specifically identify the individual who said, "Did you do it, did you shoot?," when in fact G.M. did single out Defendant Wooten as the speaker.

[10] Defendant Herndandez's pre-trial motion to dismiss based on insufficiency of the evidence, argued within his motion to dismiss based on grand jury misconduct, is also denied. A motion to dismiss an indictment which is founded upon evidence concerning the alleged offense falls within the province of the finder of fact and must be deferred to the jury. See United States v. Lunstedt, 997 F.2d 665, 667 (9th Cir. 1993).